Filed 12/20/21  P. v. Sanchez CA1/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>GUILLERMO GARCIA SANCHEZ,<br><br>        Defendant and Appellant. | A157538<br><br>(Contra Costa County<br>Super. Ct. No. 5-170849-4) |

Defendant Guillermo Sanchez stabbed Isela Moreno to death on Thanksgiving 2015.  At the time, 21-year-old Sanchez and 23-year-old Moreno were in a sexual relationship, and she was cooking for him at his brother's house.  L.P., who was affiliated with the brothers' gang, witnessed the killing.  L.P. was initially also a suspect, and Sanchez's defense at trial was that L.P. was the killer.

A jury convicted Sanchez of first degree murder, and he was sentenced to 31 years to life in prison.  On appeal, he claims that (1) the evidence was insufficient to support a conviction of first degree murder; (2) the trial court erred by admitting gang evidence; (3) his trial counsel rendered ineffective assistance by failing to seek redactions of portions of police interviews in which detectives effectively opined Sanchez was guilty; (4) accomplice instructions should have been given based on L.P.'s possible role in the murder; (5) the prosecutor erred by appealing to the jury's sympathy and by

1

vouching for L.P.; and (6) the cumulative effect of these errors requires reversal. Sanchez also claims, and the Attorney General agrees, that the matter must be remanded for the trial court to exercise its new discretion under Senate Bill No. 1393 (2017–2018 Reg. Sess.) (Senate Bill No. 1393) whether to strike a five-year enhancement for a prior serious felony under Penal Code[1] section 667, subdivision (a) (section 667(a)). We agree that remand is required for this purpose but otherwise affirm.[2]

I.
FACTUAL AND PROCEDURAL
BACKGROUND

### A. Background

At the time of the murder on November 26, 2015, Sanchez lived with his older brother, Victor, and a few roommates in Victor's house in North Richmond (the house).[3] Victor and his girlfriend, with whom he had two young children, used the master bedroom upstairs, and Sanchez slept in the living room. Sanchez and Victor were members of VFL (Varrio Frontera Locos), a North Richmond subset of the Sureño street gang. L.P., a friend of the brothers' who was almost 19 years old, often spent the night at the house

---

[1] All further statutory references are to the Penal Code unless otherwise noted.

[2] Sanchez argues in a related petition for a writ of habeas corpus that he received ineffective assistance of counsel because his trial counsel failed to seek redaction of L.P.'s interviews with police or a limiting instruction about them and failed to object to the prosecutor's alleged vouching for L.P. By separate order, we deny Sanchez's habeas petition. (*In re Guillermo Garcia Sanchez*, A163470.)

[3] Because Sanchez and his brother have the same last name, we refer to Victor by his first name. No disrespect is intended.

and also slept in the living room.[4] At trial, L.P. denied being a VFL member but admitted to associating with the gang.[5]

Sanchez had a longtime girlfriend—not Moreno—who was pregnant with his child. Although he and his girlfriend had recently broken up, they were still in contact and exchanging messages about their relationship. According to Victor, Sanchez loved his girlfriend "more than anything in the world," and the couple's messages before the murder showed Sanchez wanted to get back together but she was concerned he was seeing other women. On Thanksgiving morning, Sanchez texted the girlfriend, "I really love u." That afternoon, he sent her a message she suspected was for another woman. The girlfriend's last message to him, about an hour before the murder, was, "Man be straight up do yu have a girl??? Were yu talking to one in a serious way??? I want honesty! And if yu feel sum for her tell me too damnnit!"

In fact, Sanchez was sleeping with Moreno, who changed her Facebook status to "In a Relationship" on October 23. Moreno had a young son with another Sureño gang member but was no longer with that man. On November 18, Moreno texted Sanchez that she was going to get a pregnancy test. Four days later, she told him that she was not pregnant and did not have any sexually transmitted infections, referring to several details of their sexual interactions. In their exchanges during this time, Sanchez was often

---

[4] Victor, who testified while in custody for failing to appear as a witness, claimed that L.P. was not his friend and never stayed at the house.

[5] L.P. had convictions for domestic violence and being a felon in possession of a firearm. It was stipulated that during the incident leading to the latter conviction, which occurred about six weeks after Moreno's murder, L.P. "was arrested in a car containing two firearms with at least one member of the Sureño street gang."

unresponsive and seemed primarily interested in whether she could get narcotics for him.

L.P. testified that a few days before Thanksgiving, he woke up in the house's living room and saw Moreno lying on top of Sanchez on a recliner chair.[6] L.P. originally met Moreno when she commented on one of his Instagram posts. He exchanged messages with her on social media, but he stopped contacting her after seeing her with Sanchez, and he denied ever being romantically interested in her.

Victor confirmed that Moreno often stayed overnight at the house with Sanchez, although he was not sure whether they were in a relationship. Victor's girlfriend testified that she had seen Moreno at the house a few times before, including shortly before Thanksgiving, with a group of other young people who often hung out there.

Victor and Moreno sometimes communicated directly with each other, and on November 20 she texted him that she did not know "what [was] wrong with [Sanchez] . . . but he [was] acting [different] with [her]." Victor later told police[7] that Moreno told him she was pregnant and thought the baby was Sanchez's. At some point, Victor heard Sanchez tell Moreno to stop calling and coming over, and Victor agreed he "had the impression that [Sanchez] wasn't as romantically interested in [Moreno] as she was in him."

B.     *Thanksgiving*

On Thanksgiving morning, Sanchez and Victor's mother came over to the house to celebrate with her sons. She testified that Sanchez was not

---

[6] Moreno's cell phone records suggested she was at Sanchez's house late the night of November 20 and spent the night there on at least November 23.

[7] The Contra Costa County Sheriff's Department responded to and investigated the murder, but we refer to it and its officers as "police" for simplicity.

4

there when she arrived, but Victor, Victor's girlfriend, and their infant daughter were still in bed. Later that morning, Victor and his girlfriend went to run errands and left the baby with Sanchez's mother.

Moreno had texted Sanchez earlier that morning that she wanted to make tamales for him. When Victor and his girlfriend returned from their errands, Moreno was waiting at the house's front door, and they let her inside. Shortly before 5:00 p.m., Moreno sent Sanchez a text suggesting she was at the house and told him, "Get your ass home."

Victor's girlfriend cooked dinner, and she, Moreno, Victor, and Sanchez's mother ate together.[8] Several other people were in the backyard. Sanchez's mother told police she did not know Moreno but thought she might be Sanchez's girlfriend because Moreno was being "very friendly" toward her. Sanchez's mother asked about Sanchez because she had not seen him recently, and Moreno said, "Oh, yes. I haven't seen him either, that's why I came to . . . look for him and see if I see him."

Sanchez's mother testified that while she and Moreno were still in the kitchen, Sanchez came inside from the backyard. His mother said, "[C]ome here and give me a hug," and Moreno also told him to "give [his] mom a hug," which he then did. Sanchez's mother testified that Sanchez seemed "distracted" but not angry, and he appeared to be "looking for something." She and Moreno offered him food, but he said he would eat later and returned to the backyard.

---

[8] Victor testified that he saw Moreno outside the house, but he could not recall seeing her inside. He claimed that he could not remember much because his brain was "fried up" from drug use and he had been drinking and using drugs that Thanksgiving.

After eating, Sanchez's mother, Victor, and Victor's girlfriend went upstairs to the master bedroom with the baby to watch a movie. Victor told police that Moreno stayed downstairs to make tamales.

### C.    The Stabbing

L.P., the only witness who saw Sanchez stab Moreno, recounted various versions of the events to police and at trial.

#### 1.    November 2015 police interview

L.P. told police that he arrived at the house around 4:00 p.m. on Thanksgiving. He had spent the previous night at his girlfriend's house, which was a few blocks away, and had gone to his mother's house in San Pablo to change clothes before returning to North Richmond. When L.P. entered the house, Sanchez was on the couch in the living room with Moreno, whom L.P. claimed he had never met before. L.P. said the two were "quiet." Moreno "seemed pretty happy" and was looking at her phone, and Sanchez "looked like he ain't got no sleep."

L.P. and Victor, who had been upstairs, went into the backyard to smoke a cigarette.[9] L.P. claimed that he and Victor then went upstairs to the master bedroom to watch "a scary movie." L.P. got bored after about half an hour and left to buy more cigarettes, and when he returned to the house he gave one to Sanchez.

Meanwhile, Victor had come back downstairs. Moreno, who had "started cooking . . . tamales," asked Victor if he ate pork, and he responded, "No, we're allergic to pork." L.P. and Victor then went back upstairs, and when L.P. went downstairs again, Sanchez and Moreno "were arguing about

---

[9] Victor testified that that he saw L.P. outside the front of the house that morning and gave him a cigarette but did not see him inside until much later that day, when he alerted Victor to the stabbing.

6

something" in Spanish, a language he did not understand. According to L.P., he returned upstairs and told Victor that the couple was arguing. Victor told L.P. to "go try and stop them from arguing," but L.P. did not believe he could do anything about it. Instead, L.P. went back downstairs with Victor and "smoked another cigarette" before leaving around 5:00 p.m. L.P. claimed that when he left, Sanchez and Moreno were still arguing.

L.P. changed his story after police suggested it was inconsistent with what Sanchez's mother had told them. He now stated that Sanchez's mother and Victor's girlfriend were also in the bedroom when he went upstairs to tell Victor that Sanchez and Moreno were arguing. According to L.P., he heard what sounded like a physical fight downstairs, and he and the others went downstairs. Sanchez was gone, and L.P. did not see Moreno but saw a lot of blood in the kitchen.

L.P. "just got scared," because he was worried that police were "gonna think that [he] had somethin' to do with it." He left the house through the backyard, and after hopping over the fence he saw "somebody runnin'." L.P. claimed that he did not own a cell phone, and he did not call for help because he believed Sanchez's family would do so.

After police pressed L.P. to tell the truth, questioning "what was it that freaked [him] out that made [him] run up those stairs and knock on that door," he next stated that Sanchez and Moreno had been "fist fighting" in the living room. L.P. claimed that after Sanchez threw a punch at Moreno's face, he told Sanchez to stop, but Sanchez and Moreno exchanged punches. L.P. did not attempt to break up the fight physically because if either of them hit him accidentally, it would "get [him] mad" and there would "end up bein' three people fighting."

7

Finally, after police told L.P. he could "go home" if he told the truth, he said that after Sanchez and Moreno began fighting, he saw Sanchez "grab a knife" from the kitchen island. Holding the knife, Sanchez then walked toward Moreno, who had followed him. L.P. claimed he did not see Sanchez actually stab Moreno, but he thought Sanchez was going to kill her because "they're not fightin' if they're not mad. And he's not gonna go grab a knife just . . . 'cause I mean she's . . . little."[10]

### 2. Trial testimony

At trial, L.P. testified that when he arrived at the house, Sanchez's family had already eaten dinner, and Moreno was getting ready to make tamales. Sanchez's family members were upstairs, and Sanchez was not there. According to L.P., Sanchez arrived about 30 minutes later, and he seemed "a little mad or something." Contrary to what L.P. told police, he testified he could not remember Sanchez and Moreno talking to each other or otherwise interacting. L.P. also claimed that he did not spend any time with Victor that day.

L.P. testified that he and Sanchez went into the backyard to smoke a cigarette and then returned to the living room. Once inside, L.P. and Sanchez sat across from each other on couches in the living room. Moreno was sitting on a chair at the kitchen island while she prepared the tamales.

At some point, L.P. entered the kitchen. While he was standing there, Sanchez also came into the kitchen and got a knife from the island. Sanchez then returned to the living room and sat down, and L.P. opened a cabinet "to get a glass to get something to drink."

---

[10] When she died, Moreno was five feet tall and weighed about 95 pounds. According to his driver's license, Sanchez was five feet six inches tall and weighed about 160 pounds. L.P. was six feet one inch tall and weighed about 220 pounds.

L.P. testified that when he turned from facing the cabinet, he saw Sanchez stab Moreno, who was still sitting at the island. Moreno then turned in her seat and "threw a punch" toward Sanchez's shoulder. According to L.P., Moreno did not make any noises after being stabbed.

### D. L.P. Gets Help Before Fleeing.

L.P. testified that he immediately "ran upstairs" after seeing Moreno hit Sanchez and did not see her get stabbed again. L.P. knocked on Victor's door and told Victor that Sanchez was killing Moreno. L.P. indicated he did not "think it was important to help [Moreno]" or his "business to stop whatever's happening." Rather, L.P. went to get Victor "because that's [Sanchez's] brother. You know if it's his brother that grabs him, he's not going to try to swing on him."

Victor's girlfriend testified that while the family was watching the movie, she heard Moreno "talking loudly." The girlfriend then heard "someone screaming for Victor downstairs" before someone knocked on the bedroom door. Similarly, Sanchez's mother testified that as she was watching the movie, she heard "a lot of commotion" downstairs. Then, someone knocked loudly and "urgent[ly]" on the bedroom door.

Victor opened the door for L.P., who looked "scared" and "panicked." There was conflicting evidence about what L.P. said to Victor. Victor's girlfriend testified, as L.P. did, that L.P. said, "[H]e's killing her." Sanchez's mother told police that L.P. told Victor to come downstairs. At trial, however, she claimed not to understand what L.P. said because it was in English. And while Victor told police that L.P. said, "[C]ome get your brother, . . . he's fuckin' killin' her," Victor testified that he could not recall L.P. saying this.

L.P., Victor, and Victor's girlfriend went downstairs while Sanchez's mother stayed in the bedroom with the baby. L.P. testified that he saw

9

Moreno lying on the kitchen floor, but he did not see Sanchez. L.P. then ran outside to the backyard and "hopped the fence" to a neighboring backyard. He testified that as he left, he could hear Victor "screaming [L.P.'s] name."

Victor testified that by the time he and his girlfriend came downstairs, L.P. had run away. The two saw Moreno, "covered in blood," lying on the kitchen floor. Victor testified that Moreno was still breathing, and he went back upstairs to tell his mother to call the police "because it looked kind of critical."

Sanchez's mother testified that she came out of the bedroom and met Victor and his girlfriend, who were coming back up the stairs. They both seemed "scared," and Victor's girlfriend indicated that Moreno was bleeding. Sanchez's mother told the girlfriend to call for help, which she did. Sanchez's mother then went downstairs to the kitchen, where she saw Moreno lying on the floor with blood around her.

Victor stated that while he was upstairs, he heard Sanchez calling his name. He then saw Sanchez, who "looked scared" and "panicked" but did not have any blood on him. Sanchez was trying "to leave out the front door," and Victor told his brother that the police had been called. According to Victor, Sanchez then ran out the back door.

L.P. testified that meanwhile, after he went over the backyard fence, he saw Sanchez in an alleyway. Sanchez had a cut on his finger and a "[t]rickle" of blood from his hand, but L.P. did not see a knife. L.P. testified that he told Sanchez "to back up" because he was afraid that Sanchez might try to kill him too. L.P. then left and eventually went to his girlfriend's house.

E.      *The Physical Evidence and Subsequent Events*

The police were dispatched at 6:44 p.m., and the first officer arrived three minutes later. Victor's girlfriend was standing in front of the house

10

holding the baby and appeared to be "in shock." Upon entering the house, the officer saw "blood drops in the hallway and in the first two steps of the stairwell" that led to the home's second floor. There was also "blood spatter" on the hallway's wall. The blood on the hallway floor formed a "trail [that led] towards the back of the house." Victor and his mother, who were at the top of the stairs, also appeared to be "in shock." The officer did not observe any blood on them or on Victor's girlfriend.

The officer followed the blood trail to the kitchen, where he observed Moreno "on her back with both her arms wide out, her eyes open, in a pool of blood." Near her feet was "a small table . . . with a chair that was upside down on the table," and another chair was lying on its side nearby. The door to the backyard was "wide open."

The officer could tell that Moreno had been stabbed many times "[f]rom her neck . . . all the way down to her . . . bottom breast line," and blood was "all over" her and the floor. Moreno was not breathing, and the officer's attempts to resuscitate her were unsuccessful. She was pronounced dead at 7:01 p.m., although the officer believed she was dead by the time he arrived.

Moreno, who was not pregnant when she died, had 41 stab wounds to her upper body. The murder weapon was never recovered, but the pathologist who performed her autopsy testified that it was a knife whose blade was likely five to six inches long and half an inch to an inch wide.

Moreno had two deep wounds on both sides of her neck, all four of which would have been fatal because they cut through her jugular vein and carotid artery. There were also about a dozen wounds to her chest, breasts, and upper abdomen, as well as a deep wound to her left armpit. The knife fractured her sternum and six of her ribs, and her lungs and heart were punctured, which would also have been fatal. The pathologist testified that

11

her injuries would have caused "profuse bleeding," including blood "spurting" from the carotid wound.  He opined that the knife would likely have become "bloody" and "slippery in the hands of the assailant," who might have cut himself as a result.

Moreno also had numerous defensive wounds, primarily on her left forearm and the palm and back of her left hand.  The pathologist testified that it appeared Moreno "tried to protect herself, either by using her arms to shield her body or by actually trying to grab for the knife.  There's evidence of both types of defensive wounds."  She also had three shallow wounds on her back, near her right shoulder.  The pathologist explained that although most of the wounds were on the front of Moreno's body, suggesting that she and her assailant "were face to face for the bulk of the interaction," the wounds on her back suggested that at some point she "was either trying to leave or trying to escape."  None of her wounds would have been immediately fatal, permitting her to try to protect herself, but "as she lost blood, she would have lost strength, gotten less aware, became drowsy, and then collapsed and then died" from blood loss.

Several bloodstains were on the walkway from the house's front door to the sidewalk and on the sidewalk near the driveway.  A criminalist testified that the bloodstains "appear[ed] to [come] from the same source," as they formed "a trail from the front door down the walkway [and] . . . around . . . the driveway."  DNA testing on four representative samples from the trail of blood drops found in and around the house confirmed it was Sanchez's blood.

It was stipulated that in a search of another Sureño gang member's home in Pittsburg, police discovered a sweatshirt, jeans, a glove, and a cell phone, all of which were "bloody."  It was also stipulated that Sanchez was wearing the clothes when he arrived at the Pittsburg house on the night of

the murder, at which point he asked for a change of clothes and then left, leaving the bloody items behind. The blood was Sanchez's, but Moreno's DNA could not be detected on the items. Sanchez's DNA was not detected on clothes Moreno was wearing when she died.

Two days after the murder, L.P. turned himself in after learning he was wanted for Moreno's murder. He testified that when he talked to police, he was concerned he would be labeled a snitch, suggesting this was why his story kept changing. During the interview, he told police he was wearing the same jeans and shoes he had been wearing on Thanksgiving. The jeans and shoes were collected, and neither had blood on them.

Soon after the murder, Sanchez called his mother and told her he was in Mexico with his father. Sanchez was eventually apprehended in Mexico, and he was brought back to the United States in January 2017.

### F. The Verdict and Sentencing

Sanchez was charged with one count of murder, with the accompanying allegation that he personally used a knife during the offense.[11] It was also alleged that he had a 2014 conviction for street terrorism, a strike, and a serious felony.[12]

The jury convicted Sanchez of first degree murder and found true the knife allegation. After he waived a jury trial on the prior conviction allegations, the trial court found them true but struck the strike in the interest of justice, mostly based on Sanchez's youth. The court sentenced him

---

[11] The murder charge was under section 187, subdivision (a), and the knife allegation was under section 12022, subdivision (b)(1).

[12] The strike allegation was made under sections 667, subdivisions (d) and (e), and 1170.12, subdivisions (b) and (c), and the serious felony allegation was made under section 667(a)(1). The underlying conviction was under section 186.22, subdivision (a).

to 31 years to life in prison, composed of a term of 25 years to life for the murder and consecutive terms of one year for the knife use and five years for the prior serious felony.

## II.
### DISCUSSION

*A.    Substantial Evidence Supports the Murder Conviction.*

Sanchez claims that there was insufficient evidence of premeditation and deliberation, requiring his conviction to be reduced to second degree murder.  We are not persuaded.

1.    General legal standards

When evaluating a claim that a conviction lacks sufficient evidence, " 'we review the whole record to determine whether . . . [there is] substantial evidence to support the verdict . . . such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citation.]  In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence.' " (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.)  " '[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding.' " (*People v. Avila* (2009) 46 Cal.4th 680, 703.)  Rather, reversal is warranted only if " 'it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." ' " (*People v. Cravens* (2012) 53 Cal.4th 500, 508.)

"Murder is the unlawful killing of a human being . . . with malice aforethought."  (§ 187, subd. (a).)  "All murder that is perpetrated by . . . willful, deliberate and premeditated killing . . . is murder of the first degree." (§ 189, subd. (a).)  "In the context of first degree murder, ' "premeditated"

14

means "considered beforehand," and "deliberate" means "formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action." ' " (*People v. Lee* (2011) 51 Cal.4th 620, 636.) The required mind state "is uniquely subjective and personal. It requires more than a showing of intent to kill; the killer must act deliberately, carefully weighing the considerations for and against a choice to kill before . . . complet[ing] the acts that caused the death." (*People v. Chiu* (2014) 59 Cal.4th 155, 166.) "[T]he reflection necessary to establish premeditation and deliberation is not measured by duration of time: 'Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly, but the express requirement for a concurrence of deliberation and premeditation excludes from murder of the first degree those homicides . . . which are the result of mere unconsidered or rash impulse hastily executed.' " (*People v. Wright* (1985) 39 Cal.3d 576, 593.)

In *People v. Anderson* (1968) 70 Cal.2d 15 (*Anderson*), the Supreme Court "provided one framework for reviewing the sufficiency of the evidence supporting findings of premeditation and deliberation." (*People v. Solomon* (2010) 49 Cal.4th 792, 812.) *Anderson* observed that the evidence typically found sufficient to support such findings " 'falls into three basic categories: (1) facts about how and what [the] defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be characterized as "planning" activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a "motive" to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of "a

15

pre-existing reflection" and "careful thought and weighing of considerations" rather than "mere unconsidered or rash impulse hastily executed" [citation]; [and] (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a "preconceived design" to take [the] victim's life in a particular way for a "reason" which the jury can reasonably infer from facts of type (1) or (2).' " (*People v. Thomas* (1992) 2 Cal.4th 489, 516–517.)

*Anderson* explained that a verdict of premeditated murder is generally upheld " 'when there is evidence of all three types and otherwise requires at least extremely strong evidence of [planning] or evidence of [motive] in conjunction with [evidence of] either [planning] or [manner of killing].' " (*People v. Halvorsen* (2007) 42 Cal.4th 379, 420.) The Supreme Court has emphasized that " '*Anderson* did not purport to establish an exhaustive list that would exclude all other types and combinations of evidence that could support a finding of premeditation and deliberation.' " (*People v. Solomon*, *supra*, 49 Cal.4th at p. 812.) Rather, *Anderson*'s "guidelines are descriptive . . . , and . . . reviewing courts need not accord them any particular weight." (*Halvorsen*, at p. 420.) Nonetheless, as do the parties, we use the *Anderson* factors to frame our discussion.

2.     Analysis

In claiming there was insufficient evidence of premeditation and deliberation, Sanchez first focuses on planning activity. He asserts that "there was no evidence that [he] arrived at the . . . house on Thanksgiving . . . with any plan to harm [Moreno]," since not only did he did not bring a weapon with him, several other people were there so he would have known that a killing would be quickly detected.

16

We agree with the Attorney General, however, that L.P.'s testimony about Sanchez's activities in the living room and kitchen leading up to the stabbing constitutes substantial evidence that Sanchez premeditated the murder. (See *People v. Avila*, *supra*, 46 Cal.4th at p. 703 [generally, " 'the testimony of a single witness is sufficient for the proof of any fact' "].) L.P. testified that Sanchez came into the kitchen, grabbed a knife, sat back down in the living room, and then returned to the kitchen and stabbed Moreno. "That [Sanchez] armed himself prior to the attack 'supports the inference that he planned a violent encounter.' " (*People v. Elliot* (2005) 37 Cal.4th 453, 471.) The murder may not have been *well*-planned, as Sanchez committed it in front of L.P. while other witnesses were nearby, but the lack of efforts to avoid detection did not prevent the jury from inferring that Sanchez formed a plan to kill Moreno before he attacked her.

In addition, although according to L.P.'s testimony only a short amount of time passed between when Sanchez retrieved the knife and when he stabbed Moreno, "under California law premeditation and deliberation can occur in a brief period of time," and "[t]he lack of evidence of extensive planning does not negate a finding of premeditation." (*People v. Brady* (2010) 50 Cal.4th 547, 563–564 [sufficient evidence of first degree murder where defendant killed police officer within a few minutes of being pulled over].) Sanchez argues that it is speculative to infer that he "actually premeditated and deliberated" from the "mere fact that [he] had time to consider his actions," but more than the passage of time supported that inference. As Sanchez acknowledges, L.P. testified that Sanchez and Moreno did not interact before the stabbing, which was evidence that the murder was unprovoked. The jury could have thus reasonably inferred that the murder

17

"was the result of a deliberate plan rather than a 'rash explosion of violence.' " (*People v. Miranda* (1987) 44 Cal.3d 57, 87.)

Sanchez argues that evidence of motive was also lacking. According to him, "[t]here is nothing in the record concerning [his] prior relationship with [Moreno] or his conduct with her that would suggest a motive for the stabbing, other than speculation, conjecture, surmise, and suspicion." In fact, there was plenty of evidence that Moreno was pursuing a relationship with Sanchez even though he was not interested in her and wanted to get back together with his girlfriend. Moreno showed up at his home on Thanksgiving and involved herself in his family's get-together even though he had told her not to come over anymore, and he was simultaneously fielding accusations from his girlfriend about another woman. It is not speculative to conclude this situation gave Sanchez a motive to kill Moreno, even if that motive was irrational. (See *People v. Pensinger* (1991) 52 Cal.3d 1210, 1238.)

Finally, Sanchez argues that there was insufficient evidence "from which the jury could have inferred that the manner of killing . . . was so particular and exacting that [he] must have intentionally killed according to a preconceived design to kill." He claims that "[t]he wounds appeared to be wild and unaimed, consistent with a frenzied, impulsive attack," which "reflects a state of mind of someone going berserk and not one in which premeditation should be inferred." But as the Attorney General points out, Sanchez "concentrated on the critical area from [Moreno's] neck to her upper chest," and case law recognizes that numerous stab wounds placed where they were likely to kill support a finding of premeditation. (E.g., *People v. Pride* (1992) 3 Cal.4th 195, 247–248 [dozens of stab wounds concentrated on victim's chest and back]; *People v. Nazeri* (2010) 187 Cal.App.4th 1101, 1109, 1118 [victims had several stab wounds around head and neck]; *People v.*

18

*Gonzalez* (2005) 126 Cal.App.4th 1539, 1544, 1552 [victim had "multiple deep puncture wounds, mostly to his chest and back"].) Although the manner of killing here could *also* be "associated with someone losing his mind and going berserk" (*Nazeri*, at p. 1118), it did not compel that conclusion.

In short, the evidence that Sanchez prepared to kill Moreno before he started stabbing her, had a motive for wanting her dead, and focused his attack on vulnerable areas of her body was sufficient for the jury to conclude that he acted with premeditation and deliberation. Substantial evidence supports the murder conviction.

*B.     The Gang Evidence Was Properly Admitted.*

Sanchez claims the trial court erred by admitting gang evidence because it was unduly prejudicial under Evidence Code section 352 (section 352). We conclude there was no error.

1.     Additional facts

a.     The trial court's rulings

Before trial, Sanchez moved to exclude evidence that he was a Sureño. Although he was not charged with any gang-related activity, the prosecution contended that gang evidence was relevant to explain the actions of Victor and L.P., primarily their motive to lie. Sanchez argued that the evidence either feared gang retaliation was "minimal at best," since Moreno was also a Sureño associate and "[i]t is highly unlikely that the Sureños would do anything to avenge or assist someone who killed her, especially while she was making tamales for the killer on Thanksgiving day."

The trial court determined that some gang evidence was relevant to L.P.'s state of mind, as his fear of "being on paperwork" or considered "a snitch" bore on "his credibility and his willingness to cooperate and to explain

his minimizing during his testimony."[13]  The court explained, "[I]n my world, a normal person [who] witnesses a murder does not jump the fence and run away, does not have to be subjected to a long interview at the police department, does not refuse to come to court on a subpoena, does not get arrested, does not go to jail, does not continue to fight cooperating. [¶] A jury will be faced with thinking [L.P.] is a liar if there's no other explanation for his behavior.  And that's why I'm finding it highly probative."

As for Victor, the trial court found the gang evidence was relevant even if he did not fear retaliation because it demonstrated "[h]is loyalty to his brother and his loyalty to the gang."  Indeed, soon before trial, Victor was recorded throwing a gang sign toward Sanchez in the courtroom, and the court ruled that the prosecution could present evidence about that occurrence.

The trial court also ruled that a gang expert could testify that the Sureños are a street gang and that the sign Victor threw was "a Sureño gang sign," as well as to what "snitching or being on paper[work]" means and "what it means to be loyal to the gang."  But it excluded evidence that the house was a Sureño hangout, as well as evidence of "any monikers" or "predicate acts."

In ruling, the trial court indicated it was prepared to give a limiting instruction about the gang evidence.  The jury was subsequently instructed that "[g]ang evidence was admitted only for the purpose of assessing credibil[it]y of the witnesses" and that this evidence could not be considered for any other purpose.

---

[13] As discussed below, "being on paperwork" refers to one's participation in a criminal investigation being documented.

The topic of gang evidence arose again during L.P.'s testimony, when the attorney representing L.P. indicated that "there might be questions asked that would elicit a Fifth Amendment response." After L.P. was examined outside the jury's presence, the trial court ruled that he would be compelled to answer questions about whether he knew about or was part of the VFL or Sureño gang. The court also confirmed that he could be asked whether Sanchez and Victor were VFL or Sureño members and that he could be questioned about snitching and being on paperwork.

At this point, the trial court also elaborated on what gang-related questions would not be permitted. The court repeated that L.P. could not be asked about "[a]ny prior gang activities or specific instances of participation [in] the Sureños or the VFL"—except for the fact he was with a Sureño when he was arrested for an unrelated crime in January 2016—or about whether the house was "a gang home." The court ruled that L.P. could not be asked what VFL stands for, "what it means to be a 13 or what 13 means," or how he knew Sanchez and Victor were in a gang. Finally, the court ruled that L.P. could not be asked whether he believed the "Sureños would take revenge . . . on somebody [who] killed a high-ranking member's baby's mama."

b. The gang evidence

A detective testified that the Sureños are a criminal street gang with various subsets, including the VFL in North Richmond.[14] He explained that gangs "have their own rules they follow. And one of the rules is to—they pledge their allegiance to each other and their gang. And another rule, they don't tell on each other. They don't testify. They don't talk to cops."

---

[14] The detective was not qualified as a gang expert, but Sanchez does not claim that any of his testimony was objectionable on this basis.

L.P. denied that he was part of "the VFL Sureño street gang" at the time of Moreno's killing and testified he was "not sure" whether Sanchez or Victor was. L.P. admitted that all three of them hung out with members of that gang. In addition, a district attorney investigator testified that when arrested for failing to appear at the preliminary hearing in May 2017, L.P. said he and Sanchez were VFL members. Finally, L.P.'s preliminary-hearing testimony that Sanchez was a Sureño was admitted into evidence.

Victor testified that he was a Sureño and VFL member. The detective testified that court surveillance footage showed Victor throwing gang signs toward Sanchez while they were in the courtroom. Specifically, the detective saw Victor "throw up the [n]umber 13 with both hands," which "signifies the 13th letter of the alphabet, which is the letter M. And the letter M represents [the Sureños'] allegiance to the Mexican Mafia."

There was also evidence about snitching and the term "paperwork." L.P. indicated, and the detective confirmed, that "being on paperwork" means that "your statement is in a police report," and being a snitch "means that you [are] on paperwork and talked to the cops." Victor and the detective testified that Sureños are not supposed to snitch or testify, and L.P. testified that being a snitch means "[y]ou could end up dead or just sent to the hospital." L.P. and the detective also agreed that a gang member who snitches is supposed to drop out of the gang.

The record contains several statements by L.P. about "paperwork" and his concern about talking to police. In his November 2015 police interview, L.P. asked whether "[his] name [was] gonna be in paperwork" because he was "scared about [that] too." At trial, he confirmed he was "concerned about being in paperwork" at that time, because he did not "want to be labeled a snitch."

L.P. also testified that a few weeks after that interview, he spoke to Sanchez on the phone. Sanchez asked whether he was on "paperwork," and L.P. said he was not. In a January 2016 police interview, which occurred after L.P. was arrested for the unrelated crime, he said that Victor told him that if Sanchez "ever got caught, . . . the paperwork gonna come out." And according to the district attorney investigator who spoke to L.P. before the preliminary hearing, L.P. said he was afraid to testify against Sanchez because if he snitched, the gang would retaliate against him. At trial, L.P. denied being directly threatened by Sanchez or anyone else, however.

### 2. General legal standards

Evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) The fact finder "may consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of [the witness's] testimony," including "[t]he existence or nonexistence of a bias, interest, or other motive." (*Id.*, § 780, subd. (f).)

Even if evidence is otherwise relevant and admissible, it may be excluded under section 352 "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (§ 352; *People v. Scott* (2011) 52 Cal.4th 452, 490.) " ' "Prejudice," as used in . . . section 352, is not synonymous with "damaging." [Citation.] Rather, it refers to evidence that uniquely tends to evoke an emotional bias against the defendant as an individual, and has little to do with the legal issues raised in the trial.' " (*People v. Miles* (2020) 9 Cal.5th 513, 587.)

23

"Because gang evidence creates a risk that the jury will infer that the defendant has a criminal disposition and is therefore guilty of the charged offense, 'trial courts should carefully scrutinize such evidence before admitting it.'" (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1167; see *People v. Hernandez* (2004) 33 Cal.4th 1040, 1049.) Nevertheless, gang evidence "is not insulated from the general rule that all relevant evidence is admissible if it is relevant to a material issue in the case other than character, is not more prejudicial than probative, and is not cumulative." (*Samaniego*, at p. 1167.) Gang evidence may be "relevant on the issue of a witness's credibility" in particular. (*Id.* at p. 1168.) For example, "'[e]vidence that a witness is afraid to testify or fears retaliation for testifying,'" including "'[a]n explanation of the basis for the witness's fear,'" is generally admissible. (*People v. Sandoval* (2015) 62 Cal.4th 394, 402, 429–430 (*Sandoval*) [discussing witness's fear of testifying against gang member]; *People v. Pettie* (2017) 16 Cal.App.5th 23, 44 [same].)

We review the trial court's evidentiary rulings for an abuse of discretion. (*People v. Miles*, *supra*, 9 Cal.5th at p. 587.) Under this standard, reversal is not warranted "' "' "except on a showing that the [trial] court exercised its discretion in an arbitrary, capricious[,] or patently absurd manner that resulted in a manifest miscarriage of justice." ' " ' " (*Id.* at pp. 587–588, italics omitted.)

### 3. Analysis

As to L.P., Sanchez claims that although "[e]vidence that a witness is fearful of retaliation is relevant to that witness's credibility[,] . . . it is the existence of the threat or fear, and not its source, that is relevant to [that issue]." Sanchez argues that the gang evidence was thus cumulative and "of minimal, if any, probative value" because there were several explanations

24

other than fear of gang retaliation for why L.P. told different stories. For example, according to Sanchez, L.P. had a motive to lie to avoid prosecution for the murder and, later, to mitigate the consequences of the charge for which he was arrested in January 2016. Sanchez also claims that L.P. "was worried about being labeled a snitch . . . because of the ethos of the community to not cooperate with the police," not because of "gang retaliation or intimidation," since neither Sanchez nor anyone acting for him ever threatened L.P.

Contrary to Sanchez's position, there was plenty of evidence that L.P. was reluctant to tell the truth because he was worried about gang retaliation, including L.P.'s statements to that effect. Based on this record, "paperwork" is a concept used by gangs in particular, and the challenged evidence was relevant to demonstrate what the term meant and why it was significant that Sanchez and Victor mentioned it to L.P., as well as that L.P. himself was concerned about it. Sanchez's claim that if L.P. had feared retaliation, he "would have recanted" and not "inculpated [Sanchez] more and more as time went on" is speculative.

Sanchez also argues that the source of a witness's fear is not relevant to credibility. *Sandoval*, the case he cites for that proposition, made the point in the context of explaining why threats against a witness were relevant even if they came from people other than the defendant. (*Sandoval*, *supra*, 62 Cal.4th at pp. 428–430.) In other words, *Sandoval* was explaining why threats were relevant *despite* their source, not suggesting that the source of threats is never relevant. To the contrary, as *Sandoval* also makes clear, " '[a]n explanation of the basis for the witness's fear [of testifying] is . . . relevant to [the witness's] credibility and is well within the discretion of the trial court.' " (*Id.* at pp. 429–430.) Moreover, even if L.P. had not been

25

worried about retaliation, the evidence that he and Sanchez were in the same gang was also relevant to furnish a reason that L.P. initially refused to admit he had seen Sanchez kill Moreno. Thus, the gang evidence was undoubtedly relevant to the issue of L.P.'s credibility.

Nor was this evidence cumulative just because L.P. may have had other motives for not being truthful. The possibility of gang retaliation—which might include death—furnished a powerful reason for L.P. to lie that went beyond any desire not to be seen in "the community" as a snitch or any general reluctance to talk to police. Moreover, the evidence that Sanchez and Victor at least indirectly pressured L.P. not to talk was concrete evidence that L.P. legitimately feared retaliation. That evidence lacked context without testimony explaining "paperwork" and its significance to gangs.

As to Victor, Sanchez claims that "there was no basis to allow the introduction of gang evidence" because their familial relationship was sufficient to demonstrate Victor's "bias or motivation or loyalty" toward Sanchez. Thus, Sanchez claims, the fact that the two belonged to the same gang was cumulative and "added little to further the prosecutor's objective of showing that Victor was biased and not a credible witness." We might agree if L.P. was not part of this case, and the primary point of the gang evidence was to establish that Victor had a motive to lie. (See *People v. Maestas* (1993) 20 Cal.App.4th 1482, 1495 [that defendants were in same gang was cumulative of other evidence establishing their close relationship].) But given the evidence that Victor communicated with L.P. about "paperwork" and flashed gang signs at Sanchez in the courtroom, the gang evidence showed that Victor's bias went beyond a mere willingness to lie to protect Sanchez. Thus, it was relevant and not cumulative.

26

We also conclude that the trial court did not abuse its discretion by concluding the gang evidence's probative value was not substantially outweighed by the potential for undue prejudice. We recognize that where, as here, there are no gang charges, "evidence of gang membership . . . should not be admitted if its probative value is minimal." (*People v. Hernandez*, *supra*, 33 Cal.4th at p. 1049.) But as discussed above, the gang evidence was very relevant as it bore on credibility, particularly that of L.P., the only witness to the murder. As Sanchez recognizes, L.P.'s testimony was key to the case, and the gang evidence shed light on why L.P.'s story shifted.

Moreover, the gang evidence was reasonably limited, focusing on the fact of membership and the impetus not to cooperate with law enforcement. Thus, we cannot agree with Sanchez that the evidence would have led the jury to believe that he "was a bad person who had been involved in violent actions in the past, had not been punished for his past misdeeds, and needed to be punished now." To the contrary, there was no evidence of any of Sanchez's past misdeeds except the murder itself, and the gang evidence "did not emphasize the general violent nature of gang activity or suggest that [his] gang membership predisposed him to violent crimes, but instead focused narrowly on the prosecution's theory" for why witnesses were untruthful. (*People v. McKinnon* (2011) 52 Cal.4th 610, 656.) Accordingly, the trial court did not err by admitting the gang evidence.

C.    *Sanchez's Trial Counsel Did Not Render Ineffective Assistance by Failing to Seek Redactions of Interviews or a Limiting Instruction Addressing Police Opinions About Veracity and Guilt.*

Sanchez contends that his trial counsel rendered ineffective assistance "[b]y failing to redact harmful portions of the police interviews" of Victor and L.P. that were played for the jury. Sanchez claims that investigators made statements indicating that L.P. was credible and they thought Sanchez killed

Moreno, which amounted to impermissible opinion testimony. Sanchez also argues that his counsel was ineffective by failing, "in the alternative, [to] request and obtain a limiting instruction" about the statements. He fails to demonstrate either deficient performance or resulting prejudice, and we therefore reject the claim.

### 1. Additional facts

Most of the statements Sanchez claims his trial counsel should have sought to have redacted were made by police during the interviews of L.P. in November 2015 and January 2016. In the first interview, investigators told L.P. they "already [knew] the answer to" many questions they would ask and repeatedly pressed him to be honest. A detective told L.P., "I wanna make it very clear, . . . I'm not saying . . . [¶] . . . [¶] . . . we're looking at you as the person who did this. But you have some knowledge, a little bit more knowledge, of what went down, downstairs." Later, after telling L.P. he was "tellin' the truth" but "still skipping over pertinent facts about what happened," another detective stated, "Do I think you held [Moreno] down and stabbed her? . . . No[,] okay? But you saw something. You were in that kitchen." This detective also repeatedly suggested that L.P. was in trouble because "somebody else" put him there by killing Moreno in front of him.

Sanchez claims that portions of L.P.'s second police interview should have also been redacted. One of the detectives opined that L.P. "[was] probably about 95% honest with [his] last statement," i.e., his previous interview. The same detective also told L.P., "[C]ontinue to be honest. 'Cause, if you remember, . . . when [we] . . . had, like, a three[-]hour conversation last time, your story changed three times before [the] majority of . . . [¶] . . . [¶] the truth came out. And I understand . . . [¶] . . . [¶] it's hard to talk about seeing somebody die, but if you didn't have shit to do with it, it's

28

easier to give up the guy that did than you goin' down for a murder beef that you had nothin' to do with, right?"  The detective continued, referring to Sanchez, "[H]e's not the sharpest tool in the shed when it comes to committin' crimes.  I mean, think about it, . . . he brutally . . . murdered a chick right in front of you for a stupid fuckin' reason. [¶] . . . [¶] . . . [R]egardless of how you feel about the homies and . . . the life that you're livin' right now, this is gonna go to court, regardless; and you're gonna have to testify about what happened in that kitchen[,] regardless.  That's to keep you from being a suspect in a murder.  Do you get that?  He did this shit in front of you."  The detective concluded by telling L.P., "I believe you didn't have anything to do with it.  I believe you were there when it happened.  I believe there was more to it that you didn't tell me, but you're gonna have to testify. . . . You're a witness in a murder."

Sanchez claims that statements a detective made during the interview of Victor should also have been redacted.  First, before reading Victor his rights, the detective stated, "Now, I know that you're not the one that stabbed this chick; okay?"  Second, after pressing Victor to identify any people who were in the backyard, the detective explained that if he failed to do so "all we have to look at is [Sanchez].  And your mama already said [Sanchez] was there."  Third, insinuating that Sanchez might himself face gang retaliation for the murder, the detective told Victor, "Look, this is the deal:  You know people are gonna be out there looking for your brother and it's not us."

Finally, Sanchez claims that at minimum, his trial counsel should have requested a limiting instruction as to the challenged statements, but he does not identify what such an instruction should have said.  In his reply brief, he points out that the jury was instructed under CALCRIM No. 303 that "[h]earsay statements made at the scene indicating that [he] was a suspect

[were] admitted only for the purpose of explaining law enforcement's subsequent conduct." Thus, we will assume the instruction he claims should have been sought would have limited consideration of the statements at issue for a similar purpose.

## 2. Analysis

Criminal defendants have the right to the effective assistance of counsel under the Sixth Amendment of the United States Constitution and article I, section 15 of the California Constitution. (*Strickland v. Washington* (1984) 466 U.S. 668, 687; *In re Long* (2020) 10 Cal.5th 764, 773.) To prevail on a claim of ineffective assistance of counsel, a defendant must show "that counsel's performance was deficient," such that "counsel was not functioning as the 'counsel' [constitutionally] guaranteed," and "that the deficient performance prejudiced the defense." (*Strickland*, at p. 687; *People v. Centeno* (2014) 60 Cal.4th 659, 674.) Thus, a defendant must demonstrate both that (1) "counsel's performance . . . fell below an objective standard of reasonableness under prevailing professional norms" and (2) there was "a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different." (*People v. Mai* (2013) 57 Cal.4th 986, 1009 (*Mai*).)

"When examining an ineffective assistance claim, a reviewing court defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance. It is particularly difficult to prevail on an appellate claim of ineffective assistance. On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no

satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*Mai, supra,* 57 Cal.4th at p. 1009, italics omitted.)

As the parties agree, "generally a lay witness may not express an opinion about the veracity of another person's statement because the statement's veracity is for the jury to decide." (*People v. Houston* (2012) 54 Cal.4th 1186, 1221; see Evid. Code, § 800.) Likewise, " ' "[o]pinions on guilt or innocence are inadmissible because they are of no assistance to the trier of fact." ' " (*People v. Woodruff* (2018) 5 Cal.5th 697, 760 (*Woodruff*).) But police opinions about a witness's truthfulness may be admissible for other limited reasons, such as to explain an investigation's course. (See *People v. Dryden* (2021) 60 Cal.App.5th 1007, 1026–1027.)

Even if we assume that Sanchez's trial counsel could have successfully sought to exclude the challenged statements, she may have had a rational reason for failing to do so. The Attorney General suggests that counsel could have chosen not to object because "[p]art and parcel of her defense that [L.P.] killed [Moreno] was that the police targeted [Sanchez] because they had already made up their minds he was guilty. Demonstrating that the police pressured [L.P.] and only believed him when he said what they wanted to hear was consistent with, and buttressed, that defense." We agree this would have been a valid tactical reason for not objecting to the challenged statements. (See *Woodruff, supra,* 5 Cal.5th at p. 762 [attempting to show investigation was inadequate because police believed defendant guilty is "a reasonable defense strategy"].) Not only did the statements confirm that L.P. was never seriously investigated, they supported the idea that he *was* lying, because in changing his story he was telling the detectives only what they wanted to hear. Sanchez responds that counsel could have effectively argued

31

that L.P. killed Moreno without the challenged statements, but mere argument that police focused on Sanchez to the exclusion of L.P. would not have carried the same weight as the detectives' own words on the subject. In sum, since the challenged statements arguably also supported Sanchez's defense, we cannot say that counsel's failure to object to them or ask for a limiting instruction fell below professional standards.

Finally, even if Sanchez's trial counsel had rendered ineffective assistance in this respect, the deficiency was harmless. As the Attorney General asserts, "the thrust of the [challenged statements] is that the police thought [Sanchez] was guilty of killing [Moreno]. . . . But that was hardly news to the jury; after all, the police arrested [him] and he was on trial for [her] murder." Thus, even if the police opinions were inadmissible, they did not convey any material information that the jury "would not have already inferred" from the fact that Sanchez, and not L.P., was being tried for Moreno's murder. (*People v. Riggs* (2008) 44 Cal.4th 248, 300; *Woodruff*, *supra*, 5 Cal.5th at p. 762.) Moreover, L.P.'s interviews, the primary focus of Sanchez's claim, were played after L.P. and several other witnesses had already testified. Thus, the jury was not preconditioned to believe that L.P. was truthful before being able to judge his credibility for itself. And finally, the jury was instructed that it alone was responsible for deciding what had happened and whether witnesses were credible, and "we see nothing in the record that would lead us to conclude that the jury was likely to disregard [those] instructions." (*Riggs*, at p. 300.) In short, there is no reasonable probability that counsel's failure to seek redactions or a limiting instruction affected the verdict.

In resisting this conclusion, Sanchez claims that "the only real question for the jury to decide was whether [L.P.'s] testimony, that [Sanchez] stabbed

[Moreno], was credible." Sanchez argues that since L.P. was "a less than perfect witness" and "[h]is story . . . lacked substantial corroboration," the challenged statements may well have "skewed the jury's verdict to conviction."

Although L.P.'s testimony was undoubtedly a crucial part of the case against Sanchez, there was significant other evidence that Sanchez, and not L.P., murdered Moreno. Sanchez's blood was trailed through the house and outside. He also left bloody clothes with an acquaintance on the night of the murder. Sanchez suggests the blood evidence was not telling because he lived at the house and Moreno's DNA was not found on his clothing, but no reasonable fact finder would conclude that Sanchez just happened to bleed all over both himself and the scene for some reason unrelated to the murder. In contrast, there was *no* physical evidence tying L.P. to the murder, and although both men fled, L.P. quickly turned himself in while Sanchez evaded capture for over a year. Finally, Sanchez had a motive for killing Moreno, whereas there was little to no support for the defense's theory that she had spurned L.P. In short, the evidence that Sanchez committed the murder far outweighed the evidence supporting his defense that L.P. did, and Sanchez therefore fails to demonstrate that the police opinions were prejudicial based on the supposed weakness of the case against him.

D.   *No Substantial Evidence Supported an Instruction on Accomplice Testimony.*

Sanchez next argues that the trial court erred by failing to give sua sponte CALCRIM No. 334, which addresses accomplice testimony. We conclude that no such instruction was required, because there was no substantial evidence that L.P. acted as Sanchez's accomplice.

Section 1111 defines an accomplice "as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in

33

which the testimony of the accomplice is given." " 'To be chargeable with an identical offense, a witness must be considered a principal under section 31.' [Citations.] In other words, there must be evidence of that person's 'guilt . . . based on a combination of the direct perpetrator's acts and the aider and abettor's own acts and own mental state.' " (*People v. Johnsen* (2021) 10 Cal.5th 1116, 1155.)

To be considered by the jury, an accomplice's testimony must "be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof." (§ 1111.) In addition, since "an accomplice has a natural incentive to minimize his own guilt before the jury and to enlarge that of his cohorts[,] . . . the law requires an accomplice's testimony to be viewed with caution to the extent it incriminates others." (*People v. Brown* (2003) 31 Cal.4th 518, 555.) CALCRIM No. 334 is the standard instruction incorporating those principles to be given when it is disputed whether a witness is an accomplice. (See *People v. Smith* (2017) 12 Cal.App.5th 766, 779; cf. CALCRIM No. 335.)

Even absent a request, a trial court has the duty to instruct on the principles of accomplice testimony if there is " 'substantial evidence that a witness who has implicated the defendant was an accomplice.' " (*People v. Johnsen, supra*, 10 Cal.5th at p. 1155; *People v. Tobias* (2001) 25 Cal.4th 327, 331.) But " ' "if the evidence is insufficient as a matter of law to support a finding that a witness is an accomplice, the trial court may make that determination and, in that situation, need not instruct the jury on accomplice testimony." ' " (*Johnsen*, at p. 1155.) We review de novo whether a required instruction was omitted. (*People v. Waidla* (2000) 22 Cal.4th 690, 733.)

Sanchez argues that there was substantial evidence that L.P. was an accomplice, "either as an aider and abettor to the killing or the actual perpetrator." Sanchez points to the evidence that L.P. was initially a suspect, including that investigators repeatedly told L.P. he was at risk of being charged with murder and that he testified under a grant of immunity.[15] But "[t]he fact that a witness has been charged or held to answer for the same crimes as the defendant and then has been granted immunity does not necessarily establish that [the witness] is an accomplice." (*People v. Stankewitz* (1990) 51 Cal.3d 72, 90.) Likewise, "mere 'presence at the scene of a crime or failure to prevent its commission'" does not establish that the witness acted as an accomplice. (*People v. Richardson* (2008) 43 Cal.4th 959, 1024; see *People v. Lewis* (2001) 26 Cal.4th 334, 369.)

Rather, in addition to requiring that an accomplice be subject to prosecution for the same offense, "the law further requires a relationship between the defendant and accomplice, either by virtue of a conspiracy or by acts aiding and abetting the crime." (*People v. Ward* (2005) 36 Cal.4th 186, 212.) But Sanchez does not explain how any of the evidence supports the theory that he and L.P. committed the murder *together*. Sanchez points to evidence suggesting that L.P. stabbed Moreno himself, including that L.P. "knew where the knives were kept," had a supposed motive to kill her, and fled from the scene as well, but this evidence does not suggest that Sanchez also participated in the murder. Sanchez mentions in passing that he and

---

[15] Sanchez filed a request for judicial notice of the warrant for L.P.'s arrest, which the Attorney General opposes. We deny the request. Not only was the warrant not admitted below, it is unnecessary to our decision because there is other evidence in the record showing L.P. was initially a suspect. (See *People v. Hardy* (1992) 2 Cal.4th 86, 134; *People v. Doane* (2021) 66 Cal.App.5th 965, 969, fn. 1.)

L.P. "[p]resumably . . . spoke" when they went outside to smoke together, but that is hardly substantial evidence that they discussed killing Moreno beforehand. Nor is there any evidence that L.P. helped Sanchez commit the crime in any respect. In short, the record lacks substantial evidence that L.P. was an accomplice, as opposed to being the only perpetrator. Therefore, the trial court did not err by omitting an instruction on accomplice testimony.

E.    *Sanchez Forfeited His Claims of Prosecutorial Error, and His Trial Counsel Did Not Render Ineffective Assistance by Failing to Preserve Them.*

Sanchez claims the prosecutor erred in two respects: by improperly appealing to the jury's emotion in closing argument and by vouching for L.P. Relief is not available on either ground.

1.    General legal standards

Prosecutorial "error occurs, as a matter of state law, when a prosecutor 'engage[s] in deceptive or reprehensible tactics in order to persuade the trier of fact to convict.' [Citation.] Federal constitutional error occurs only when the prosecutor's actions 'comprise a pattern of conduct that is serious and egregious, such that the trial is rendered so unfair that the resulting conviction violates the defendant's right to due process of law.' " (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 854.) When a claim of prosecutorial error " 'focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' " (*People v. Smithey* (1999) 20 Cal.4th 936, 960 (*Smithey*).)

"[T]o preserve a claim of prosecutorial misconduct for appeal, ' " 'a criminal defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the impropriety.' " [Citation.] The lack of a timely objection and request for admonition will be excused only

if either would have been futile or if an admonition would not have cured the harm.' " (*People v. Hoyt* (2020) 8 Cal.5th 892, 942–943.)  The requirement is meant to " ' " 'encourage a defendant to bring errors to the attention of the trial court, so that they may be corrected or avoided and a fair trial had,' " ' " and it is " ' " 'unfair to the trial judge and to the adverse party to take advantage of an error on appeal when it could easily have been corrected at the trial.' " ' " (*People v. Forrest* (2017) 7 Cal.App.5th 1074, 1081, quoting *People v. Saunders* (1993) 5 Cal.4th 580, 590, italics omitted.)

"A defendant whose counsel did not object at trial to alleged prosecutorial misconduct can argue on appeal that counsel's inaction violated the defendant's constitutional right to the effective assistance of counsel." (*People v. Lopez* (2008) 42 Cal.4th 960, 966 (*Lopez*).)  Generally, "in the heat of a trial, defense counsel is best able to determine proper tactics in the light of the jury's apparent reaction to the proceedings.  The choice of when to object is inherently a matter of trial tactics not ordinarily reviewable on appeal." (*People v. Frierson* (1991) 53 Cal.3d 730, 749.)  Rather, as we have said, reversal on direct appeal for ineffective assistance of counsel is warranted only if "(1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation." (*Mai*, *supra*, 57 Cal.4th at p. 1009.)

### 2.    Appeal to sympathy

Sanchez challenges certain comments the prosecutor made toward the beginning of her closing argument.  Specifically, she told the jury she was "confident that [it was] going to see how Guillermo Sanchez . . . is guilty of first[]degree murder and how the vicious, violent last few moments of Isela Moreno's life were stolen from her.  From her five-year-old[,] now seven-year-

37

old son.  His life, his kisses[,] . . . [¶] . . . [¶] and his cuddles."  Sanchez's trial counsel stated, "Your Honor, I'm going to object to this," and the trial court directed the prosecutor to "move on to the next part of [her] argument."

Generally speaking, " ' "[a]n appeal for sympathy for the victim is out of place during an objective determination of guilt." ' "  (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1342 (*Seumanu*); *People v. Vance* (2010) 188 Cal.App.4th 1182, 1192–1193.)  Likewise, except in the penalty phase of a capital trial, a prosecutor may not "argue that the jury . . . should consider the impact of the crime on the victim's family." (*Vance*, at p. 1193.)  "The justification for both of these exclusionary policies is that they deal with subjects that are inherently emotional, possessing an unusually potent power to sway juries, and . . . their use must therefore be rigidly confined and controlled." (*Ibid.*)

The Attorney General argues that Sanchez forfeited this claim. Although Sanchez's trial counsel objected, she did not ask the trial court to admonish the jury to disregard the prosecutor's comments.  (See *People v. Hoyt*, *supra*, 8 Cal.5th at p. 942.)  And Sanchez does not argue that any exception to forfeiture applies.  (See *id.* at pp. 942–943.)  Thus, we agree with the Attorney General that the claim was forfeited.

Sanchez argues that he is nevertheless entitled to relief because his counsel rendered ineffective assistance by failing to preserve the issue.  We are not persuaded.

First, we agree with the Attorney General that Sanchez's counsel could have had a legitimate reason for failing to seek an admonition.  (See *Mai*, *supra*, 57 Cal.4th at p. 1009.)  The trial court had already directed the prosecutor to move on, and counsel could have determined that further discussion would unhelpfully keep the jury's focus on the issue.  (See *People*

38

*v. Harris* (2008) 43 Cal.4th 1269, 1290.) Sanchez does not attempt to refute this point or otherwise demonstrate that counsel could have had no rational reason for not pursuing the objection further.

Second, even if any of the prosecutor's comments were erroneous and Sanchez's counsel should have asked for an admonition, there is no reasonable probability that the omission affected the verdict. The challenged comments were a small portion of the closing argument, and the prosecutor did not mention Moreno's son again or overly emphasize the murder's brutality, a topic that was inescapable given the evidence. (See *Seumanu*, *supra*, 61 Cal.4th at p. 1344 [prosecutor's brief remarks "could not have prejudiced [the] defendant"].) Moreover, the jury was instructed not to let "bias, sympathy, prejudice, or public opinion influence [its] decision," an instruction we presume it understood and followed. (See *People v. Ramirez* (2021) 10 Cal.5th 983, 1017–1018.) In particular, we disagree with Sanchez that this instruction "would have had no mollifying or curative force because there was a substantial likelihood that the jurors would not have treated the prosecutor's argument as improper." If anything, the trial court's response to Sanchez's counsel's objection would have conveyed to the jury that the prosecutor's comments were inappropriate. Counsel's decision not to pursue the objection further was harmless.

### 3. Vouching

Sanchez also argues that "the prosecutor improperly attempted to boost [L.P.'s] credibility before the jury in several deceitful and dishonest ways." He focuses on the prosecutor's examination of L.P. about L.P.'s testimony at the preliminary hearing and her closing argument addressing L.P.'s immunity agreement. We reject this claim.

a.      Additional facts

L.P. testified at the spring 2017 preliminary hearing only after he initially failed to appear and was arrested. On cross-examination at trial, L.P. acknowledged that he testified under a grant of immunity at the preliminary hearing. He also admitted that he had a 2017 conviction of domestic violence. On redirect, the prosecutor questioned L.P. about these topics as follows:

"Q.     When you testified under the grant of immunity at the preliminary hearing, is it fair to say that the domestic violence misdemeanor conviction that you recently suffered was still a pending case?

"A.     Wait, what?

"Q.     Like, you hadn't resolved it. You hadn't pled to it.

"A.     I actually did.

"Q.     But not until after you testified at the preliminary hearing; is that fair to say?

"A.     No.

"Q.     So let me ask you this. When you came and you were in jail when you testified at the preliminary hearing for not coming to court—

"Do you remember that?

"A.     Yeah.

"Q.     Did you have to then go to Alameda County in custody and go to their jail?

"A.     Yeah. Because you guys made me miss a court date.

"Q. And then . . . you had to resolve that case and take care of it, right?

"A. No. That case is already [taken] care of. It was a court date . . . to see if I was taking my classes.

"Q. But . . . you had to answer questions about that case—

"A. No, I didn't.

"Q. —when you testified at the preliminary hearing?

"A. Yes.

"Q. And so part of you testifying would have been answering questions that you had a Fifth Amendment . . . privilege . . . about that case; is that fair to say?"

The defense objected, and after a bench conference, the prosecutor continued:

"Q. Is it fair to say that the immunity agreement that . . . you were testifying under didn't protect you from perjuring yourself on the witness stand?

"A. I guess.

"Q. Lying on the witness stand. We could still file charges against you for that.

"A. Yeah."

The May 2017 immunity agreement, which was admitted into evidence and published to the jury, provided in relevant part, "After the witness testifies, if the court determines that the witness would have been privileged to withhold that information, but for the provisions of Penal Code

41

section 1324, the witness will be granted use immunity.[16]  Therefore, none of the statements obtained from the testimony of the witness, nor information derived from the testimony in this case may be used in any criminal prosecution against the witness.  This is not transactional immunity.  The witness may still be prosecuted for any crimes committed, including perjury or contempt for failing to answer questions while testifying in this case."

In closing, the prosecutor addressed L.P.'s grant of immunity while arguing that Sanchez did not kill Moreno in the heat of passion.  The prosecutor urged the jury to conclude that L.P. was lying to police when he originally said Sanchez and Moreno were fighting before the killing, evidence that might support a verdict of voluntary manslaughter.  The prosecutor told the jurors that L.P. "never told the police he saw a stabbing," even though "you knew that he saw it" because he was "bawling" during the interview.  The prosecutor continued, "And [L.P.] told you what he saw with his eyes.  And he testified at the preliminary hearing about what he saw, under a grant of immunity, where that evidence couldn't be used against him.  That would have been the time for him to say, I did it.  When I couldn't have prosecuted him for what he said. [¶] No, that's when he came and told the truth.  That's when he said he saw the stabbing.  And that testimony at the preliminary hearing is consistent with what he told you here, when he said he was silent before that stabbing."

---

[16] " 'Use immunity protects a witness only against the actual use of [the witness's] compelled testimony, as well as the use of evidence derived therefrom.  Transactional immunity protects the witness against all later prosecutions relating to matters about which [the witness] testifies.' " (*People v. Vines* (2011) 51 Cal.4th 830, 882, fn. 24.)

b.      Analysis

Generally, " '[i]mpermissible "vouching" may occur where the prosecutor places the prestige of the government behind a witness through personal assurances of the witness's veracity or suggests that information not presented to the jury supports the witness's testimony.' " (*Seumanu, supra,* 61 Cal.4th at p. 1329.)  Improper vouching may occur during either a prosecutor's questioning or argument. (See *id.* at p. 1330.)  "The vice of such remarks is that they 'may be understood by jurors to permit them to avoid independently assessing witness credibility and to rely on the government's view of the evidence.' [Citation.]  However, these limits do not preclude all comment regarding a witness's credibility.  ' " '[A] prosecutor is given wide latitude during argument.  The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom.' " ' " (*People v. Bonilla* (2007) 41 Cal.4th 313, 336–337.)

First, Sanchez claims that the prosecutor improperly tried to create the impression that L.P. was credible because L.P. "was so forthcoming at the preliminary examination [that] he answered questions related to a subject matter that he did not have to, as he had a Fifth Amendment privilege [not to] answer questions concerning his misdemeanor spousal battery case from Alameda County."  According to Sanchez, L.P. entered a plea to the charge and was sentenced on January 7, 2017, five months before the preliminary hearing.[17]  Thus, Sanchez reasons, L.P. actually "did not have any valid

---

[17] Sanchez asks us to take judicial notice of a portion of L.P.'s criminal record that reflects L.P.'s plea and sentence for the misdemeanor, a request the Attorney General opposes.  We deny the request because this document also was not presented to the trial court and is not necessary to our decision.

privilege against self-incrimination . . . that he could assert at the time he testified at the preliminary examination" unless an appeal of his conviction was pending. (See *People v. Fonseca* (1995) 36 Cal.App.4th 631, 635 [privilege retained at least until sentencing and pending resolution of appeal]; see also *People v. Lopez* (1999) 71 Cal.App.4th 1550, 1554 [privilege disappears if conviction not appealed].)

Assuming, without deciding, that L.P. did not have a Fifth Amendment privilege related to the misdemeanor case at the time of the preliminary hearing, we conclude that Sanchez forfeited this aspect of his claim. His trial counsel objected to the prosecutor's question about this topic, apparently with success, as the prosecutor did not return to it after the unreported bench conference. Indeed, L.P. never actually answered the question. Sanchez does not contend that the mere asking of the question created incurable harm, and counsel never asked that the jury be admonished. Accordingly, Sanchez cannot complain that the trial court's halting of the question was insufficient.

In turn, Sanchez fails to demonstrate that his trial counsel rendered ineffective assistance by failing to request an admonition or, at least, to request that the objection be sustained on the record. Having successfully prevented the prosecutor from obtaining an answer to the question, counsel could have "decided it would be unhelpful to have the jurors admonished" or further pursue the objection, "since doing so could have emphasized the issue." (*People v. Pettie, supra*, 16 Cal.App.5th at p. 81.) Sanchez's cursory assertion that competent counsel would not have wanted the jury to "hear improper argument and questioning from the prosecutor" bolstering L.P.'s credibility does not persuade us otherwise.

---

(See *People v. Hardy, supra*, 2 Cal.4th at p. 134; *People v. Doane, supra*, 66 Cal.App.5th at p. 969, fn. 1.)

Second, relying on *People v. Rodriguez* (2020) 9 Cal.5th 474, Sanchez claims the prosecutor erred by asking questions related to L.P.'s immunity agreement to establish L.P. could be charged with perjury if he lied during his testimony. In *Rodriguez*, the Supreme Court held that the prosecutor's argument that two law enforcement witnesses "would not lie because each would not put his 'entire career on the line' or 'at risk' constitute[d] impermissible vouching," since there was no evidence that giving false testimony would expose the officers to being fired. (*Id.* at p. 481.) The court declined to determine whether another of the prosecutor's arguments, that the witnesses would not expose themselves to " 'possible prosecution for perjury,' " likewise amounted to improper vouching. (*Id.* at pp. 479, 483.) In doing so, however, the court observed: "That a perjury prosecution for false testimony was 'possible' may have been a fact within the common knowledge of jurors; however, . . . a lay juror would naturally think that a prosecutor would know more about when someone can be prosecuted for perjury than a juror. For this reason, prosecutors are well advised to generally avoid raising the subject of future perjury prosecutions in their closing arguments." (*Id.* at p. 483.)

Sanchez's trial counsel did not object to the prosecutor's comments about the possibility that L.P. could be prosecuted for perjury, and the argument is therefore forfeited. Nor did counsel's omission constitute ineffective assistance of counsel. Unlike the comments about prosecution for perjury in *Rodriguez*—which the Supreme Court merely suggested were inadvisable—the prosecutor's statements indicating that L.P. could be prosecuted for perjury despite the immunity agreement were clearly based on information in the record, namely the agreement's own statement to that effect. Sanchez does not claim that the agreement was improperly admitted,

45

and counsel could have reasonably decided not to object to questioning that referred to something already in evidence.

Third, Sanchez claims that the prosecutor falsely argued to the jury "that all [L.P.] had to do was to admit that he had killed [Moreno] and . . . he could not be prosecuted for the admission." Sanchez contends that the prosecutor's "argument misrepresent[ed] 'use' immunity," which "does not immunize a witness from a prosecution that is . . . separate and apart and not derived from the witness's testimony." Once again, this claim is forfeited, because the defense did not object below to the prosecutor's argument or request an admonition, and Sanchez does not claim that an exception to forfeiture applies.

Nor did the failure to object to the prosecutor's argument constitute ineffective assistance of counsel. Although Sanchez correctly describes use immunity (see *People v. Vines*, *supra*, 51 Cal.4th at p. 882, fn. 24), the challenged argument was technically consistent with the principle that a witness may still face prosecution so long as the prosecution is not based on the immunized testimony. The prosecutor argued that if L.P. had testified at the preliminary hearing that he stabbed Moreno, "*that evidence*"—his testimony—"couldn't be used against him," and "[she] couldn't have prosecuted him for *what he said*." (Italics added.)

We acknowledge that a lay juror might have nonetheless inaccurately concluded "that all [L.P.] had to do was testify that he had stabbed [Moreno], and he would/could never be charged with her killing or subsequently prosecuted." But even if the challenged argument was misleading, it was not so clearly improper that Sanchez's trial counsel could have had no rational reason for failing to object to it. In any event, as the case law recognizes, defense counsel may validly decide not to object even if the objection has

46

merit.  (See, e.g., *People v. Huggins* (2006) 38 Cal.4th 175, 206 [rational not to object to avoid calling attention to prosecutor's remarks]; *People v. Frierson*, *supra*, 53 Cal.3d at p. 749 [rational to counter prosecutor's point with argument instead of objecting].)

Finally, even if reasonably competent counsel should have more fully objected to the statements of which Sanchez complains, we conclude that the failure to do so was harmless because there is no reasonable probability that the verdict was thereby affected.  As we have said, L.P.'s testimony was crucial evidence against Sanchez, but we agree with the Attorney General that "the jury had ample opportunity to 'judge [L.P.'s] credibility independently of the prosecutor's argument.'"  (Quoting *People v. Johnson* (1992) 3 Cal.4th 1183, 1225 [concluding alleged vouching was harmless].)  In addition to hearing L.P.'s live testimony, the jurors viewed the recordings of his interviews with police, and they could evaluate his changing story for themselves.  Moreover, the jury was instructed under CALCRIM No. 222 that the attorneys' questions and arguments were not evidence and under CALCRIM No. 226 that it alone was responsible for judging the credibility of witnesses, instructions we presume it followed.  (See *People v. Ramirez*, *supra*, 10 Cal.5th at pp. 1017–1018.)  In short, any improper vouching, and thus counsel's failure to object fully to it, was harmless.

F.    *No Cumulative Error Appears.*

Sanchez also claims that even if the errors he has identified are not prejudicial individually, they cumulatively denied him due process and a fair trial.  The trial court did not err by admitting gang evidence or failing to instruct on accomplice testimony, however, and Sanchez has not shown that his trial counsel rendered ineffective assistance in any respect relating to the

47

police opinions or alleged prosecutorial errors. Thus, his claim of cumulative error fails.

> G. *Remand Is Required for the Trial Court to Consider Whether to Strike the Section 667(a) Enhancement.*

Finally, Sanchez claims that pursuant to Senate Bill No. 1393, remand is required for the trial court to exercise its discretion whether to strike the five-year term for the prior serious felony under section 667(a). The Attorney General concedes, and we agree, that remand is required.

When Sanchez was sentenced in 2018, trial courts had no discretion to strike an enhancement for a prior serious felony under section 667(a). Effective January 1, 2019, however, Senate Bill No. 1393 amended the law to enable courts to strike such an enhancement in the interest of justice under section 1385. (*People v. Garcia* (2018) 28 Cal.App.5th 961, 971.) The legislation is retroactive and applies to all judgments that, like Sanchez's, are not yet final. (*Id.* at pp. 971–972.)

In such circumstances, remand is required unless it would be futile because " ' "the record shows that the trial court would not have exercised its discretion even if it believed it could do so." ' " (*People v. McDaniels* (2018) 22 Cal.App.5th 420, 425; *People v. Garcia, supra,* 28 Cal.App.5th at p. 973, fn. 3.) As the parties agree, the record does not demonstrate that remand would be futile. To the contrary, the trial court expressed concern about the length of Sanchez's sentence in light of his youth, and it struck the prior strike in the interest of justice. Accordingly, remand is required for the court to exercise its discretion whether to strike the section 667(a) enhancement.

## III.
### DISPOSITION

The matter is remanded for the trial court to exercise its discretion whether to strike the enhancement under Penal Code section 667, subdivision (a).  In all other respects, the judgment is affirmed.

_____
Humes, P.J.

WE CONCUR:


_____
Margulies, J.



_____
Banke, J.




*People v. Sanchez*  A157538

50